Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
D. Sandoval, Deputy
8/31/2015 1:01:00 PM
Filing ID 6834318

1  Kevin D. Neal (Bar No. 011640)
   Lincoln Combs (Bar No. 025080)
2  Liana J. Garcia (Bar No. 027452)
   GALLAGHER & KENNEDY, P.A.
3  2575 East Camelback Road
   Phoenix, Arizona 85016-9225
4  Telephone:   (602) 530-8000
   Facsimile:    (602) 530-8500
5  kevin.neal@gknet.com
   lincoln.combs@gknet.com
6  liana.garcia@gknet.com

7  Marc J. Victor (Bar No. 016064)
   Marc J. Victor, P.C.
8  3920 S. Alma School Road, Suite 5
   Chandler, Arizona 85248
9  Telephone:  (480) 455-5233
   Fax:  (480) 857-0150
10 marc@attorneyforfreedom.com

11 Attorneys for Plaintiff Jessie Thornton

12              **SUPERIOR COURT OF THE STATE OF ARIZONA**

13                          **COUNTY OF MARICOPA**

14

15 JESSIE THORNTON,                           No. CV2013-096393

16                 Plaintiff,                 **PLAINTIFF'S MOTION FOR
                                              LEAVE TO AMEND COMPLAINT**
17 v.
                                              (Assigned to the Honorable David K.
18 CITY OF SURPRISE, a jural entity; J.J.     Udall)
   OTTERMAN and JANE DOE
19 OTTERMAN, husband and wife; JOHN
   and JANE DOES I-X; BLACK and WHITE
20 CORPORATIONS I-X, inclusive,

21                 Defendants.

22         Plaintiff, through counsel, herein moves the Court for leave to amend his

23 Complaint, pursuant to Rule 15(a) Ariz. R. Civ. P. Through depositions, Plaintiff has

24 discovered facts which support new causes of action. A copy of Plaintiff's proposed

25 amended complaint is attached as Exhibit A, pursuant to Rule 15(a)(2) Ariz. R. Civ. P.

26 Plaintiff's Motion for Leave to Amend should be granted because (1) amendment is in the

*(left margin vertical text)* Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

interests of justice; (2) amendment would not unduly prejudice Defendants; (3) Plaintiff's Motion is not made in bad faith, with dilatory motive, or as a result of undue delay; and (4) Arizona courts favor the liberal allowance of requests to amend pleadings. Plaintiff's Motion for Leave to Amend is supported by the following Memorandum of Points and Authorities, the attached exhibits, and the Court's record herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   BRIEF FACTUAL BACKGROUND

Mr. Thornton is African-American. He has been the victim of racial profiling and harassment by the Surprise Police Department for years. Mr. Thornton has been pulled over numerous times and accused of several minor traffic violations, which Mr. Thornton maintains never occurred. This pattern of harassment culminated on December 7, 2012, at approximately 11:16 p.m., when Mr. Thornton was subjected to an unreasonable stop and arrest by Officer J.J. Otterman. This stop ultimately led to Mr. Thornton being falsely charged with driving under the influence, despite a lack of probable cause to support the charge and evidence which indicated the crime had not occurred.

After being placed under arrest, Mr. Thornton was transported to the Surprise Police Station. Once at the Police Station, Officer Otterman had Mr. Thornton submit to an intoxylizer test. The results of the test showed Mr. Thornton's BAC at 0.000. Mr. Thornton was then evaluated by Officer Boothe, a trained Drug Recognition Expert (DRE). After the DRE examination, Officer Boothe reported to Officer Otterman that Mr. Thornton was cordial, cooperative and showed no signs of impairment from any drugs or alcohol. Despite this evidence, or lack thereof, Mr. Thornton was cited for driving under the influence.

Mr. Thornton was arrested for driving under the influence despite a lack of any probable cause to substantiate such a charge and the existence of evidence Mr. Thornton was not impaired or under the influence. This was done after a pattern of continuous

2

harassment by various officers of the Surprise Police Department. With the wrongful arrest of Mr. Thornton the Surprise Police Department violated Mr. Thornton's rights as they relate to the Fourteenth Amendment of the U.S. Constitution and Article 2 of the Arizona Constitution.

Mr. Thornton's Complaint was filed on December 6, 2013. Since that time, Plaintiff has sent written discovery requests (all of which were met with objections).[1] Plaintiff recently took the depositions of Defendant J.J. Otterman and Officer Quentin Boothe.

Officer Boothe was the DRE on duty on the night that Mr. Thornton was arrested and charged with driving while impaired by drugs or alcohol. *See* Quentin Boothe deposition at 12:1-10, attached as Exhibit B. Officer Boothe testified that he used a standard protocol on which he was trained to detect whether Mr. Thornton exhibited any signs of being impaired by drugs or alcohol. *Id*. at 16:10-17. Officer Boothe further testified that after conducting a detailed examination of Plaintiff, according to that standard protocol, he detected no signs that Mr. Thornton had consumed any type of alcohol or drug. *Id*. at 21:5-23. He detected absolutely no signs that Thornton was impaired by drugs or alcohol, and Mr. Thornton registered a .000 on the breathalyzer.

Officer Boothe testified that he communicated this information to Officer Otterman. Officer Otterman confirmed these events in his testimony. He was then asked why he charged Mr. Thorton after learning from the DRE Officer that there was absolutely no evidence of impairment. Officer Otterman replied that once he was told this by Officer Boothe, he called his supervisor. His supervisor ordered him to charge Mr. Thornton with driving while impaired by drugs anyhow. Even though there was no objective evidence that Mr. Thornton was impaired by drugs or alcohol, and Officer Otterman *knew* there was no evidence that Mr. Thornton was impaired, he followed the

---

[1] Mr. Thornton was recently forced to file a motion to compel.

1    instructions of his supervisor. *See* Joshua James Otterman deposition at 53:12-15, attached

2    as Exhibit C.

3         Given Officer Boothe's testimony that Officer Otterman's supervisor was

4    apparently aware that there was no evidence that Mr. Thornton was impaired by drugs or

5    alcohol, yet directed Officer Otterman to charge him anyway, it is clear that Mr. Thornton

6    now has sufficient legal basis to plead the additional causes of as set forth in the proposed

7    amended complaint. Officer Otterman's actions were performed at the direction of his

8    Supervisor. This indicates that a policy of the City of Surprise were a moving force behind

9    the violations complained of in Mr. Thornton's Complaint. *See* Plaintiff's Proposed

10   Amended Complaint, attached as Exhibit A – Counts II, III, IV, V, VI, and VII. This fact

11   pattern is also indicative of the City of Surprise's failure to appropriately supervise and

12   train its officers. *Id.* Mr. Thornton sought a stipulation from Defendants to amend the

13   complaint, but Defendants refused to so stipulate. *See* Exhibit D, email of June 11, 2015

14   between Liana Garcia and Elan Mizrahi. Accordingly, Mr. Thornton was compelled to

15   seek leave to amend from this Court.

16   **II.   LAW AND ARGUMENT**

17        **A.   Leave to Amend should be freely granted.**

18        Ariz. R. Civ. P. 15(a) states, in pertinent part:  "[a] party may amend the party's

19   pleading … only by leave of court or by written consent of the adverse party. Leave to

20   amend *shall be freely given* when justice requires. Ariz. R. Civ. P. 15(a)(1)(B) (emphasis

21   added). Granting leave to amend a pleading is always left to the sound discretion of the

22   trial judge. *Cagle v. Carr*, 101 Ariz. 225, 418 P.2d 381 (1966); *Contractor & Mining*

23   *Service & Supply, Inc. v. H & M Tractor & Bearing Corp.*, 4 Ariz. App. 29, 417 P.2d 542

24   (1966). However, amendments should be liberally allowed in the interest of justice.

25   *Sanders v. Brown*, 73 Ariz. 116, 238 P.2d 941 (1951).

26

4

In this case, Mr. Thornton has discovered new causes of action through the use of discovery. Thus, the interests of justice require that he be allowed to amend his Complaint. Even though Mr. Thornton seeks to add additional causes of action, Defendants have been on notice of the gravitas of Mr. Thornton's claims since the inception of this lawsuit, and would not be prejudiced by such an amendment.

Moore's Federal Practice, 15.08(3) states: (Rule 15(a))[2] applies equally to plaintiffs and defendants and leave to amend may be sought for any purpose related to the pleadings. The clearest cases for leave to amend are correction of an insufficient claim or defense and amplification of previously alleged claims or defenses. *Moore's* at p. 887. Wright & Miller, Federal Practice and Procedure § 1394 echoes the sentiment set forth in Moore's: "Indeed, the courts generally have been quite liberal about granting leave to replead when the amendment was not interposed for reasons of delay or would not result in prejudice." Wright & Miller at p. 871.

**B.    Leave to amend is in the interest of justice in this case.**

The policy underlying Rule 15(a) is liberal in favor of permitting amendments, and a motion to amend is generally granted unless there has been undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, or under prejudice to the adverse party. *Owen v. Superior Court of the state of Ariz., In and For Maricopa County*, 133 Ariz. 75, 649 P.2d 278 (1982). Plaintiffs not only obtained the officers' testimony, but sought leave of counsel for the City before bringing this Motion. *See* Exhibit D. The request was denied, but the basis remains on firm legal ground.

The policy of freely granting leave to amend a pleading is to be applied with extreme liberality. Ariz. R. Civ. P. 15(a). Generally, Rule 15 advises the court that "leave shall be freely given when justice so requires." This policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir.2001)

---

[2] Arizona's Rule 15(a) is modeled after the Federal Rule.

1   (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990)).

2   In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court

3   offered the following factors a district court should consider in deciding whether to grant

4   leave to amend: "In the absence of any apparent or declared reason—such as undue delay,

5   bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

6   by amendments previously allowed, undue prejudice to the opposing party by virtue of

7   allowance of the amendment, futility of amendment, etc.—the leave sought should, as the

8   rules require, be "freely given." *Id*. at 182, 83 S.Ct. 227. *See also Allen v. City of Beverly*

9   *Hills*, 911 F.2d 367, 373 (9th Cir.1990)(citing *Foman* factors, as well as "previous

10  amendment"); *Hurn v. Ret. Fund Trust of the Plumbing, Heating & Piping Indus. of S.*

11  *Cal.,* 648 F.2d 1252, 1254 (9th Cir.1981).

12          **C.**   **Amendment would not unduly prejudice Defendants.**

13          Mr. Thornton has sought the agreement of defense counsel prior to filing this

14  Motion, but defense counsel declined to so stipulate, alleging the request was overdue. *See*

15  Exhibit D. Delay alone, however, is not ordinarily sufficient grounds for denying a request

16  for leave to amend. *Uyleman v. D.S. Rentco*, 194 Ariz. 300, 981 P.2d 1081 (Ct. App. Div.

17  1 1991). Delay is only a factor if it would *demonstrably* and *unduly* prejudice the adverse

18  party. *Preston v. Kindred Hospitals West, LLC*. 226 Ariz. 391, 249 P.3d 771 (2011).

19  (emphasis added).

20          There is no such prejudice here. Defendants have been on notice of Mr. Thornton's

21  allegations since he filed his Notice of Claim with the City in 2013. Allowing Mr.

22  Thornton to amend his Complaint in the interests of justice would not prejudice the City.

23  In fact, the City is in possession of discovery which Mr. Thornton has been seeking for

24  several months – even years – but has objected to providing. It is only through discovery

25  that Mr. Thornton has been apprised of the extent of the violations of his civil rights, the

26  City's actual or *de-facto* policies which are the moving forces behind those violations, and

6

1    the City's failure to properly train and supervise its officers. These discoveries are the

2    cornerstones of the Section 1983 claims Mr. Thornton seeks to add to his Complaint.  Mr.

3    Thornton would be the only party prejudiced if his Motion for Leave to Amend was

4    denied.

5         Prejudice is the "touchstone of the inquiry under Rule 15(a)." *Lone Star Ladies Inv.*

6    *Club v. Schlotzsky's Inc*., 238 F.3d 363, 368 (5th Cir. 2001); *Howey v. United States*, 481

7    F.2d 1187, 1190 (9th Cir. 1973)(stating that "the crucial factor is the resulting prejudice to

8    the opposing party"); *cf. DCD Programs*, 833 F.2d at 186-87 (noting that party opposing

9    amendment "bears the burden of showing prejudice"). Absent prejudice, or a strong

10   showing of any of the remaining *Foman* factors, there exists a presumption under Rule

11   15(a) in favor of granting leave to amend. *See Lowrey v. Tex. A & M Univ. Sys*., 117 F.3d

12   242, 245 (5th Cir. 1997). A simple denial of leave to amend without any explanation by

13   the court is subject to reversal. Such a judgment is "not an exercise of discretion; it is

14   merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."

15   *Foman*, 371 U.S. at 182, 83 S.Ct. 227; *Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv.*

16   *Bureau*, 701 F.2d 1276, 1292-93 (9th Cir. 1983)(noting "where the record does not clearly

17   dictate the district court's denial, we have been unwilling to affirm absent written

18   findings"); *Rolf v. City of San Antonio*, 77 F.3d 823, 828-29 (5th Cir. 1996); *United*

19   *Steelworkers of Am., AFL–CIO v. Mesker Bros. Indus., Inc.,* 457 F.2d 91, 94 (8th Cir.

20   1972).

21        Mr. Thornton is not altering the factual allegations contained in his Complaint;

22   Defendants have been on notice of the gravitas of Mr. Thornton's claims since the

23   inception of the lawsuit (and indeed, the notice of claim). There is simply no evidence that

24   allowing Mr. Thornton leave to amend would substantially prejudice Defendants. Thus,

25   there is a strong presumption in favor of granting leave to amend.

26

**D.      None of the criteria for denying leave to amend apply to this case.**

Arizona law recognizes very few criteria for denying leave to amend: (1) where the proposed amendment is legally insufficient and would not affect the outcome. *Walls v Arizona Department of Public Safety*, 170 Ariz. 591, 826 P.2d 1271 (Ct. App. Div. 1 1991); (2) undue delay; (3) bad faith; (4) dilatory motive, repeated failures to cure deficiencies by previous amendments; (5) if it would demonstrably and unduly prejudice the adverse party. *Preston v. Kindred Hospitals West, LLC*. 226 Ariz. 391, 249 P.3d 771 (2011); *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), or (5) If the amendment seeks to add a claim that the trial court has previous found to be without evidentiary support. *Tovera v. Nolan* (App. 1993). None of those criteria apply to this case.

First, the proposed amendment is not legally insufficient. Plaintiff is adding causes of action which have strong foundations in the facts of the case and the applicable law. Mr. Thornton's Motion has not been made in bad faith; in fact Mr. Thornton has sought the City's agreement to amend but has been denied same. The only evidence of bad faith or undue delay is on Defendants' part. Defendants' failure to comply with disclosure and discovery obligations is described separately in Mr. Thornton's Motion to Compel. It is only through discovery that Mr. Thornton was made aware of the extent to which the City's policies and supervisory practices were a moving force behind the violations he complains of, and thus the basis for his newly alleged causes of action. Finally, there is no evidence that Defendants would be prejudiced by Mr. Thornton's proposed amendment. *See* Section II-C, above. Because none of the criteria for denial of leave to amend apply in this case, there is a strong presumption in favor of granting leave to amend here.

## III.   CONCLUSION

Mr. Thornton's Motion for Leave to Amend is well- supported by the facts and the law. Arizona courts favor the liberal allowance of requests to amend pleadings, and there

is no basis for this Court to depart from that practice and policy. Accordingly, Mr. Thornton respectfully requests this Court grant his Motion.

DATED this 31st day of August, 2015.

GALLAGHER & KENNEDY, P.A.

By: /s/ Kevin D. Neal

Kevin D. Neal
Lincoln Combs
Liana J. Garcia
2575 East Camelback Road
Phoenix, Arizona  85016-9225
Attorneys for Plaintiff Jessie Thornton

COPY mailed same day to:

Larry J. Crown, Esq.
Elan S. Mizrahi, Esq.
Titus, Brueckner & Levine PLC
8355 East Hartford Drive, Suite 200
Scottsdale, Arizona 85255
Attorneys for Defendants

Sharlee Weaver

4857740v1/26076-0001

# EXHIBIT A

Kevin D. Neal (Bar No. 011640)
Lincoln Combs (Bar No. 025080)
Liana J. Garcia (Bar No. 027452)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:   (602) 530-8500
kevin.neal@gknet.com
liana.garcia@gknet.com

Marc J. Victor (Bar No. 016064)
Marc J. Victor, P.C.
3920 S. Alma School Road, Suite 5
Chandler, Arizona 85248
Telephone: (480) 455-5233
Fax: (480) 857-0150
marc@attorneyforfreedom.com

Attorneys for Plaintiff Jessie Thornton

**SUPERIOR COURT OF THE STATE OF ARIZONA**

**COUNTY OF MARICOPA**

| | |
|---|---|
| JESSIE THORNTON, | No. CV2013-096393 |
| Plaintiff, | PLAINTIFF'S FIRST AMENDED COMPLAINT |
| v. | |
| CITY OF SURPRISE, a jural entity; J.J. OTTERMAN and JANE DOE OTTERMAN, husband and wife; JANE DOES I-X; BLACK and WHITE CORPORATIONS I-X, inclusive, | (Assigned to the Honorable David K. Udall) |
| Defendants. | |

Plaintiff JESSIE THORNTON, by and through undersigned counsel, for his

Complaint against Defendants, alleges as follows:

1.     At all times material hereto, Plaintiff JESSIE THORNTON was a resident

of Maricopa County.

1       2.    Upon information and belief, at all times material hereto, Defendant J.J.

2   OTTERMAN was a resident of Maricopa County.

3       3.    At all times material hereto, Defendant J.J. OTTERMAN was acting in his

4   capacity as an employee of the City Defendant through his employment with the Surprise

5   Police Department and the City Defendant is liable for the acts of its employees under the

6   legal theory of *respondeat superior*.

7       4.    Defendant CITY OF SURPRISE ("City Defendant") is a jural entity subject

8   to suit.

9       5.    At all times material to Plaintiff's Complaint, Defendants J.J. Otterman and

10  the City of Surprise were acting under the color of state law.

11      4<del>6</del>.    Plaintiff, JESSIE THORNTON, served a Notice of Claim in compliance

12  with A.R.S. § 12-8201.01 upon the appropriate individuals on April 30, 2013.

13      7<del>6</del>.    Plaintiff, JESSIE THORNTON, complied with the Notice of Claim

14  requirements under State law perfecting his right to pursue a claim before this court.

15      8<del>7</del>.    Defendant Jane Doe Otterman is a fictitious name for the spouse of

16  defendant J.J. OTTERMAN.  Plaintiff will seek leave of the Court to amend this

17  Complaint to set forth the true identities of this person once it becomes known.

18      9<del>8</del>.    Defendants John and Jane Does I-X, Black Corporations I-X, and White

19  Partnerships I-X are persons or entities whose names are not currently known to Plaintiff

20  but who are responsible to Plaintiff for the acts complained of herein.  Plaintiff will seek

21  leave of the court to amend his Complaint to set forth the true identities of those persons

22  or entitles once they become known.

23      10<del>9</del>.    All events giving rise to this cause of action occurred in the County of

24  Maricopa, State of Arizona, making jurisdiction and venue proper in this court.

25

26

**COUNT I – NEGLIGENCE; GROSS NEGLIGENCE**

110. Plaintiff JESSIE THORNTON incorporates herein the allegations in the preceding paragraphs.

121. Since 2009 to the present, Plaintiff JESSIE THORNTON has been subjected to continuous and systematic racial profiling and harassment by the Surprise Police Department, a subpart of the City Defendant.

132. This systematic harassment included an incident in which Plaintiff JESSIE THORNTON was cited for failing to have a license in his possession, when at the time of the stop, JESSIE THORNTON's license was in his gym bag in the backseat of the car he was driving, and the Surprise Police Officer would not allow him to retrieve it.

14. Police officers employed by Defendant City of Surprise, acting under color of law, have followed, stopped, arrested, charged, and/or cited Plaintiff JESSIE THORNTON approximately 8 times (to date) during the time period of 2009 to the present, despite lacking the reasonable suspicion required to stop Plaintiff, or the probable cause necessary to arrest, charge, or cite Plaintiff Thornton.

15. This pattern of unconstitutional and unlawful stops, arrests, and citations constitutes an unlawful policy and custom of violating Plaintiff's federally protected constitutional rights.

1316. On or about December 7, 2012, this systematic harassment culminated when Plaintiff JESSIE THORNTON was taken into custody by Defendant J.J. OTTERMAN.

1417. On or about December 7, 2012, Plaintiff JESSIE THORNTON was unlawfully stopped by Defendant J.J. OTTERMAN, who on information or belief knowingly lacked the required reasonable suspicion to stop JESSIE THORNTON's vehicle.

1518. On or about December 7, 2012, Defendant J.J. OTTERMAN claimed that Plaintiff JESSIE THORNTON's eyes were bloodshot, but at the time, Plaintiff JESSIE

3

THORNTON was wearing glasses and Defendant J.J. OTTERMAN could not clearly see his eyes.

~~16~~19.  On or about December 7, 2012, during the stop, Defendant J.J. OTTERMAN was intentionally aggressive with Plaintiff JESSIE THORNTON and failed to conduct a proper DUI investigation.

~~17~~20.  On or about December 7, 2012, Defendant J.J. OTTERMAN performed a series of field sobriety tests on Plaintiff JESSIE THORNTON, but intentionally failed to consider information provided by Plaintiff JESSIE THORNTON that he had knee and hip injuries, which severely affected ~~the outcome of the DUI investigation~~Plaintiff's ability to perform field sobriety tests.

~~18~~21.  On or about December 7, 2012, Defendant J.J. OTTERMAN arrested Plaintiff JESSIE THORNTON despite knowingly having insufficient probable cause to do so.

~~19~~22.  Upon information and belief, Plaintiff JESSIE THORNTON maintained throughout the traffic stop and unlawful arrest that he was not impaired and had consumed no alcohol or drugs other than his blood pressure medication, which would not cause impairment.

~~20~~23.  On or about December 7, 2012, Defendant J.J. OTTERMAN took Plaintiff into custody and transported Plaintiff ~~JESSIE THORNTON~~ to the Surprise Police Station, despite lacking probable cause to arrest and seize Plaintiff.

~~21~~24.  On or about December 7, 2012, Defendant J.J. OTTERMAN had Plaintiff JESSIE THORNTON submit to an intoxylizer test, the results of which showed Plaintiff JESSIE THORNTON's ~~BAC~~ blood alcohol content at 0.000.

~~22~~25.  On or about December 7, 2012, Officer Boothe, a trained drug recognition expert with Surprise Police Department, evaluated Plaintiff JESSIE THORNTON and found him to be both cordial and cooperative, determined that Plaintiff exhibited no signs

4

of impairment, and concluded that Plaintiff was not under the influence of any drugs or

alcohol.

23**26.** Upon information and belief, Officer Boothe conveyed his these findings

and conclusions to Defendant J.J. OTTERMAN.

24**27.** On or about December 7, 2012, despite Officer Boothe's evaluation and

findings, Defendant J.J. OTTERMAN forced Plaintiff JESSIE THORNTON to submit to

a blood draw, despite lacking probable cause to force Plaintiff to submit to such a seizure.

25**28.** Plaintiff JESSIE THORNTON's blood results came back indicating no

presence of drugs or alcohol.

26**29.** On or about December 7, 2012, Defendant J.J. OTTERMAN, with full

knowledge of doing so, wrongfully and reckless disregard for Plaintiff's federally

protected rights, charged cited Plaintiff JESSIE THORNTON with Driving Under the

Influence, Impaired to the slightest Degree of alcohol or drugs, despite lacking the

probable cause for such a criminal charge.

**30.** Defendant Otterman, with the full knowledge, consent, and encouragement

of his supervisors at the City of Surprise, initiated criminal proceedings against Plaintiff

Thornton, despite lacking any objective or reasonable basis to do so.

**31.** Defendant Otterman's decision to proceed with criminal charges against

Plaintiff – despite knowing there was no reason to believe Plaintiff was guilty of the

elements of that crime – displayed a willful, malicious, and callous disregard for

Plaintiff's federally protected constitutional rights.

**32.** Defendant Otterman's actions were undertaken with the full knowledge and

consent of his supervisors at the City of Surprise, who had instituted a custom or defacto

policy of unconstitutional stops and arrests.

5

2733.  Plaintiff JESSIE THORNTON was forced to retain counsel to represent him, as a result of Defendant J.J. OTTERMAN's wrongful charging, and the City of Surprise's wrongful and malicious prosecution.

2834.  On or about February 5, 2013, the court dismissed the case against Plaintiff JESSIE THORNTON.

2935.  On or about April 17, 2013, the Honorable Ruth H. Hillard with the Superior Court of Arizona granted a petition submitted by Plaintiff JESSIE THORNTON finding him innocent of charges an clearing his record pursuant to A.R.S. § 13-4051.

3036.  Plaintiff JESSIE THORNTON was subjected to intentional harassment and racial discrimination by Defendant J.J. OTTERMAN and the City Defendantof Surprise.

## COUNT II – 42 U.S.C. § 1983 – VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHTS

37.  Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

38.  At all times, Defendant Otterman was acting under the color of law.

39.  At all times, Defendant Otterman was acting in the course and scope of his employment as a police officer for the City of Surprise.

40.  While in the course and scope of his employment with the City of Surprise, and acting under the color of law, Defendant Otterman violated Plaintiff's Fourth Amendment rights under the United States Constitution, when he unreasonably and unlawfully detained Plaintiff and seized his blood, property, and person without sufficient constitutional basis to do so.

41.  The City of Surprise is liable for Defendant Otterman's unlawful violation of Plaintiff's Fourth Amendment rights because it fostered a custom and de facto policy of unconstitutional stops and arrests.

6

42.     The City of Surprise is also liable for Defendant Otterman's unlawful violation of Plaintiff's Fourth Amendment rights because it failed to adequately train Defendant Otterman.

43.     The conduct of Defendant Otterman and the City of Surprise deprived Plaintiff of his constitutionally established rights to be free from unlawful search and seizure, and proximately caused him to incur damages, including costs, attorneys' fees, humiliation, property damage, physical pain, and mental anguish.

## COUNT III – 42 U.S.C. § 1983 – VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHTS

44.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

45.     At all times, Defendant Otterman was acting under the color of law.

46.     At all times, Defendant Otterman was acting in the course and scope of his employment as a police officer for the City of Surprise.

47.     Plaintiff, an African-American, is a member of a protected class.

48.     While in the course and scope of his employment with the City of Surprise, and acting under the color of law, Defendant Otterman violated Plaintiff's Fourteenth Amendment rights when he denied Plaintiff the equal protection of the law by improperly stopping, seizing, arresting, and charging Plaintiff with driving under the influence of drugs or alcohol, and seizing Plaintiff's property when he had no reasonable, constitutional basis to do so.

49.     Defendant Otterman's unconstitutional actions toward Plaintiff were committed with the intent or purpose to harass and discriminate against Plaintiff based on Plaintiff's membership in a protected class.

4825919v1/26076-0001

50.     The City of Surprise is liable for Defendant Otterman's unlawful violation of Plaintiff's Fourteenth Amendment rights because it fostered a custom and de facto policy of unconstitutional stops and arrests targeting African-Americans.

51.     Moreover, the City of Surprise is liable for Defendant Otterman's unlawful violation of Plaintiff's Fourteenth Amendment rights because it failed to adequately train Defendant Otterman.

52.     The conduct of Defendant Otterman and the City of Surprise deprived Plaintiff of his constitutionally established right to be treated the same under the law as similarly-situated Caucasians, and proximately caused him damages and injuries, including costs, attorneys' fees, humiliation, property damage, physical pain, and mental anguish.

### COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

53.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

54.     Defendant Otterman stopped, detained, arrested, and charged Plaintiff with driving under the influence of drugs or alcohol, despite the fact that he had no reasonable suspicion upon which to base the stop, and no probable cause upon which to base the arrest or the criminal charge.

55.     Defendant Otterman's conduct was extreme and outrageous, and his behavior in charging an innocent man with criminal conduct despite the absence of probable cause was done with reckless disregard of the certainty that his conduct would cause Plaintiff severe emotional distress.

56.     As a result of Defendant Otterman's extreme, outrageous, and unlawful conduct, Plaintiff experienced extreme emotional distress, anguish, upset, panic attacks, feelings of paranoia, and a constant suspicion that he is being "watched" by the police and can no longer trust the police to protect his person or property.

8

4825919v1/26076-0001

57.     As a result of the City of Surprise's failure to properly train Defendant Otterman, Plaintiff experienced extreme emotional distress, anguish, upset, panic attacks, feelings of paranoia, and a constant suspicion that he is being "watched" by the police and can no longer trust the police to protect his person or property.

58.     As a result of the City of Surprise's custom and de facto policy of treating African-Americans differently than similarly situated Caucasians by fostering a practice of unconstitutional stops targeting African-Americans, Plaintiff experienced extreme emotional distress, anguish, upset, panic attacks, feelings of paranoia, and a constant suspicion that he is being "watched" by the police and can no longer trust police to protect him.

**COUNT V – FALSE IMPRISONMENT**

59.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

60.     Defendant Otterman acted intentionally to restrain Plaintiff to an area within Defendants' control by unlawfully arresting and detaining Plaintiff, without legal authority to do so.

61.     Defendant Otterman acted without lawful constitutional authority and without Plaintiff's consent.

62.     Defendant Otterman's unlawful and intentional act resulted in the direct restraint of Plaintiff's liberty by actual force.

63.     Defendant Otterman's act in restraining Plaintiff would have caused a reasonably prudent person in Plaintiff's situation to believe that he was detained and unable to leave Defendants' custody.

64.     Defendant City of Surprise intentionally instigated, encouraged, and participated in Defendant Otterman's false imprisonment of Plaintiff because it fostered a

9

1   practice and de facto policy of improperly stopping, charging, and arresting African

2   American citizens without a lawful constitutional basis to do so.

3        65.    Defendant City of Surprise actively encouraged, instigated, and participated

4   in Defendant Otterman's false imprisonment of Plaintiff by failing to properly train

5   Defendant Otterman.

6        66.    As a result of Defendants' unlawful false imprisonment, Plaintiff was

7   harmed. Plaintiff experienced mental suffering, anguish, humiliation, physical discomfort,

8   inconvenience, and incurred monetary loss and property damage.

9                    **COUNT VI – ABUSE OF PROCESS**

10       67.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

11   the preceding paragraphs of this Complaint as if fully set forth herein.

12       68.    Defendants Otterman and the City of Surprise willfully used the legal

13   process primarily to accomplish an ulterior purpose for which it was not designed.

14   Specifically, Defendants used the legal process to harass and intimidate Plaintiff and other

15   African-American citizens within their jurisdiction.

16       69.    Defendants' abuse of the legal process against Plaintiff was not reasonably

17   justifiable in light of the circumstances, and can only be explained by Defendants'

18   improper purpose to harass and intimidate Plaintiff.

19       70.    Defendants' abuse of the legal process was performed with ill will, and

20   caused humiliation, emotional distress, anguish, property damage, and monetary loss to

21   Plaintiff.

22                 **COUNT VII – MALICIOUS PROSECUTION**

23       71.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

24   the preceding paragraphs of this Complaint as if fully set forth herein.

25       72.    Defendants Otterman and City of Surprise initiated and took active part in

26   the prosecution of a criminal action against Plaintiff, which terminated in Plaintiff's favor.

10

73.     In initiating criminal prosecution against Plaintiff, Defendants Otterman and the City of Surprise acted with malice and without probable cause.

74.     Specifically, Defendant Otterman proceeded to charge Plaintiff with driving while impaired by drugs or alcohol, despite the fact that he had no reasonable basis to believe Plaintiff was guilty of the elements of that crime.

75.     Defendant City of Surprise, despite the fact that it was aware of the facts and the law, chose to continue prosecution of the criminal action against Plaintiff, causing Plaintiff to incur substantial costs to clear his driving record and criminal record.

76.     The malicious conduct of Defendants Otterman and the City of Surprise caused humiliation, emotional distress, anguish, property damage, and monetary loss to Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For Plaintiff's nominal, general and compensatory damages;

2.     For Plaintiff's special damages incurred to date and to be incurred in the future for necessary medical and other related expenses;

3.     For Plaintiff's damages for physical injuries, mental anguish, humiliation, emotional distress, physical and mental pain and suffering and limitation of normal activities, both past and future, in an amount to be proven at trial.

4.     For Plaintiff's costs incurred herein;

5.     For pre-judgment and post-judgment interest at the maximum legal rate allowed by the Court;

6.     For Plaintiff's Attorneys' fees pursuant to 42 U.S.C. § 1988(b);

7.     For punitive damages against Defendant Otterman due to his reckless and callous indifference to Plaintiff's federally protected rights; and

68.     For such other and further relief as the Court deems just and proper.

11

DATED this ___ day of _____, 2015.

GALLAGHER & KENNEDY, P.A.

By: */s/ Kevin D. Neal* _____
    Kevin D. Neal
    Lincoln Combs
    Liana J. Garcia
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225
    Attorneys for Plaintiff Jessie Thornton

COPY mailed same day to:

Larry J. Crown
Elan S. Mizrahi
Jennings, Haug & Cunningham, LLP
2800 N. Central Ave, Suite 1800
Phoenix, AZ 85004-1049
Titus Brueckner & Levine, PLC
8355 E. Hartford Drive, Suite 200
Scottsdale, AZ 85255
*Attorneys for Defendants*

Sharlee Weaver _____

12

# EXHIBIT B

SUPERIOR COURT OF THE STATE OF ARIZONA
COUNTY OF MARICOPA

JESSIE THORNTON,                        )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     ) No. CV2013-096393
                                        )
CITY OF SURPRISE, a jural               )
entity; J.J. OTTERMAN and JANE          )
DOE OTTERMAN, husband and wife;         )
JOHN and JANE DOES I-X; BLACK           )
and WHITE CORPORATIONS I-X,             )
inclusive                               )
                                        )
        Defendants.                     )
                                        )

DEPOSITION OF OFFICER QUENTIN JAMES BOOTHE

Phoenix, Arizona
Friday, April 17, 2015
1:00 p.m.

REPORTED BY:
Kelly M. Olhausen, RPR
Certified Reporter
Certificate No. 50867
PREPARED FOR:
MR. KEVIN D. NEAL

(Certified Copy)



## Page 10

1  Q.  And then you came to Surprise?
2  A.  Yes, sir.
3  Q.  And what's your current job title?
4  A.  Police officer.
5  Q.  Have you held any other ranks at the Surprise
6  department or Paige?
7  A.  No, sir.
8  Q.  I understand you're a certified drug recognition
9  expert?
10  A.  At this particular time, I'm not current.
11  Q.  You were back in December of 2012?
12  A.  Yes, sir.
13  Q.  Do you hold or have you held any other
14  certifications?
15  A.  I am a radar instructor, a LIDAR instructor.  I'm
16  a certified mountain bike operator.  I'm a phlebotomist.
17  And if there is anything else, I can't think of it right
18  now.
19  Q.  You said this is the first time you've testified
20  in a deposition, which is a civil proceeding?
21  A.  Yes, sir.
22  Q.  I take it you've testified in connection with
23  criminal cases?
24  A.  Yes, sir.
25  Q.  And you've also given interviews in connection

## Page 11

1  with criminal cases?
2  A.  Yes, sir.
3  Q.  Do you know how many times you've been
4  interviewed?
5  A.  I have no idea, sir.
6  Q.  Do you know how many times you've testified in
7  court?
8  A.  I would think three.
9  Q.  Were any of those in connection with a DUI?
10  A.  Yes, sir.
11  Q.  Were any of those in connection with a drug DUI?
12  A.  No, sir.  I believe it was alcohol.
13  Q.  Did your DUI training come through the academy?
14  A.  We had basic training on DUIs in the academy.
15  Then, after that, I proceeded on to ARIDE, which is
16  advanced, and then to DRE.
17  Q.  When did you do the ARIDE?
18  A.  I believe it would have been 2009.  I'm not sure
19  which month.
20  Q.  And what did that training consist of?
21  A.  ARIDE was basically a precursor to the DRE
22  program.  It trains you to recognize signs and symptoms
23  that might be consistent with a driver that's under the
24  influence of drugs versus alcohol but also, I guess,
25  enhances your ability to detect an alcohol DUI on top of

## Page 12

1  that.
2  Q.  I described a DRE as a drug recognition expert.
3  But is the official title "drug recognition evaluator"?
4  A.  I've seen it termed as both.  It's normally
5  referred to as a drug recognition expert.
6  Q.  And however it's titled, a DRE is a police
7  officer trained to recognize impairment in drivers under
8  the influence of drugs other than or in addition to
9  alcohol?
10  A.  Yes, sir.
11  Q.  Have you ever attended an IACP training
12  conference?
13  A.  Yes.
14  Q.  How many?
15  A.  I believe I've been -- I've been either to one or
16  two.  I don't recall.
17  Q.  And the International Association of Chiefs of
18  Police, the IACP, coordinates the International Drug
19  Evaluation and Classification Program with support from
20  NHTSA; is that right?
21  A.  Right.  Sir, actually, I'm mistaken.  I haven't
22  been to the conference.  I've been to our local
23  refreshers.  I haven't actually been to the conference.
24  Q.  Okay.  They have a national conference, but they
25  also conduct courses nationally?

## Page 13

1  A.  Right.
2  Q.  And you've been to the ones -- or some of them
3  that have been held in Arizona?
4  A.  The local ones, yes, sir.
5  Q.  And when did you do your DRE training?
6  A.  I believe it was 2009 -- either 2009 or the
7  beginning of 2010.
8  Q.  Now, a DRE must successfully complete an approved
9  course in standardized field sobriety tests before
10  beginning the DRE evaluation classification?
11  A.  Yes, sir.
12  Q.  And the drug evaluation and classification
13  program, that has three phases; correct?
14  A.  I don't know how many phases it has.
15  Q.  The information I have is that there is three.
16  And the first phase is a 16-hour DRE preschool, which
17  includes an overview of the DRE evaluation procedures, the
18  seven drug categories, eye examinations, and proficiency
19  in conducting standardized field sobriety testing.
20  Does that sound right to you?
21  A.  Yes, sir, that sounds correct.
22  Q.  And you went through that process?
23  A.  Yes, sir, I did.
24  Q.  And then, phase 2 is the 56-hour DRE school,
25  which includes an overview of the drug evaluation

4  (Pages 10 to 13)



Page 14

procedures, expanded on such things as drug category and drug combinations, examination of vital signs, case prep, course testimony, and preparing a curriculum vitae.

A.   Yes.

Q.   You went through that?

A.   Yes, sir.

Q.   And then phase 3 is the DRE candidate completing a minimum of 12 drug evaluations under the supervision of a trained DRE instructor.  Did you go through that?

A.   Yes, sir, I did.

Q.   And of those 12 evaluations, the officer must identify an individual under the influence of at least 3 of the 7 drug categories and obtain a minimum 75 percent toxicological corroboration rate.

      And you did that as well?

A.   Yes, sir, I did.

Q.   Finally, there is a knowledge exam, and you must be approved by two DRE instructors before being certified as a DRE; correct?

A.   Yes, sir.

Q.   And you went through all those steps?

A.   Yes, sir, I did.

Q.   And you were current through when?

A.   Current through right about the time this case came up.  I would have to look exactly when.

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 15

Q.   Is there a reason you decided not to stay current?

A.   I wanted to go more into field training, and kind of, change my career course a little bit.

Q.   And have you done that?

A.   Not yet.  The testing is coming up soon.

Q.   How many DREs are there with the Surprise Police Department?

A.   Currently, I believe there are three.

Q.   On the night of December 7th, 2012, when Jessie Thornton's arrest occurred, were you the DRE on duty?

A.   Yes, sir.

Q.   So if there was a call for a DRE, you got the call?

A.   Yes, sir.

Q.   And that investigation was done at the Surprise Police Department?

A.   Yes, sir.

Q.   Were all of your investigations as a DRE done at the police department?

A.   No, sir.

Q.   Were some done in the field?

A.   No, sir.

Q.   Where were they done?

A.   They were done at Maricopa County District 3 and

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 16

El Mirage Police Department.

Q.   As well as the Surprise Police Department?

A.   Yes, sir.

Q.   Did you do some in the field?

A.   No, sir.

Q.   Part of the protocol is to do them in an environment such as the police department or some other facility; correct?

A.   Yes, sir.

Q.   And the DRE protocol is a standardized and systematic method of examining a driver under the influence of drugs to determine if there is, indeed, impairment; is that right?

A.   Yes, sir.

Q.   And there is a DRE protocol that, I take it, you're familiar with?

A.   Yes, sir.

Q.   I think the first item on the DRE protocol is a breath alcohol test; correct?

A.   Yes, sir.

Q.   And that is done so that you, as a DRE, can review the results and determine if the subject's apparent impairment is consistent with their breath alcohol results; correct?

A.   Yes, sir.

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 17

Q.   If the breath alcohol indicates that there is impairment due to alcohol, do you proceed with a DRE?

A.   It depends on the level.  If the level of intoxication or the level -- the BAC is not consistent with the impairment shown, then we would continue.

Q.   One of the items on the protocol is interviewing the arresting officer; is that correct?

A.   Yes, sir.

Q.   And in that step, the process is you ask the arresting officer about the subject's behavior, their appearance, and their driving?

A.   Yes, sir.

Q.   And whether the subject made any statements about drug use?

A.   Yes, sir.

Q.   The next step in the protocol involves a preliminary examination and first pulse.

      I take it you've been trained to take pulses?

A.   Yes.

Q.   Of subjects; correct?

A.   Yes, sir.

Q.   And how many times do you do that during the protocol?

A.   We take the pulse three times.

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

5  (Pages 14 to 17)



Page 18

Q. Also, as part of taking the pulse, you're conducting an overview of the subject, a preliminary physical examination to see if there is any injuries or other issues that might affect their ability to perform certain tasks?
A. Yes, sir.
Q. Is part of this process also conducting an HGN?
A. Yes, sir.
Q. Are you certified also in HGN?
A. Yes, sir.
Q. Is that still current?
A. Yes, sir.
Q. And next on the protocol, you conduct an examination -- an eye examination?
A. Yes, sir.
Q. And you're looking at vertical gaze, nystagmus?
A. I'm looking at horizontal and vertical.
Q. Both. I was doing them one at a time.
A. Yes.
Q. Vertical and horizontal?
A. Yes. Yes.
Q. You're looking for ocular convergence?
A. Yes, sir.
Q. The lack of convergence can indicate that the subject has ingested certain types of drugs; correct?

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 19

A. Yes.
Q. Next on the protocol is divided attention psychological tests?
A. Yes.
Q. And you've been trained to conduct those, such as a Rhomberg balance, walk and turn, the one-leg stand, and the finger-to-nose test?
A. Yes.
Q. And those are the four that consist of the divided attention physiological tests?
A. Yes.
Q. And then you check their blood pressure -- or their pulse again and take their blood pressure?
A. Yes, sir.
Q. You also check their eyes or their pupils to check their size and dilation?
A. Yes, sir.
Q. You also check muscle tone?
A. Yes, sir.
Q. Certain categories of drugs can cause muscles to become rigid, and others can cause it to become loose and flaccid?
A. Yes.
Q. You also check for injection sites?
A. Yes, sir.

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 20

Q. At what point do you read the subject their Miranda rights if you're going to ask them questions about illicit drug use?
A. I don't ask. That's a question that's asked of the arresting officer.
Q. Do you confirm that with the arresting officer?
A. Yes, sir.
Q. Do you confirm that with the subject?
A. Yes, sir.
Q. Based on the totality of the protocol that we've gone through, that's where you make your determinations; correct?
A. Yes, sir.
Q. It's a totality of the circumstances?
A. It's a totality, yes, sir.
Q. And your own experience?
A. Yes, sir.
Q. And then after all that's done, you'll normally order a blood sample?
A. Yes, sir.
Q. And then as part of the certification process, you need to corroborate your results or your opinions; correct?
A. Yes, sir.
Q. You corroborate those with the results of the

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

Page 21

blood sample?
A. Yes, sir.
Q. And you keep a log of that?
A. Yes, sir.
Q. You acted as the DRE for the investigation of Jessie Thornton on December 8th, 2012; correct?
A. Yes, sir.
Q. And you kept that investigation and its results in your log?
A. Yes.
Q. Did you review those before today?
A. No. I didn't look at those before I came down here.
Q. Do you remember what it is?
A. As far as his results?
Q. Yes.
A. Yes. It was "no impairment" at that time.
Q. Which is also your opinion based on your investigation?
A. Yes, sir.
Q. And the totality of the evaluation you performed on him that day?
A. Yes, sir.
Q. I'm going to hand you what we've marked as Exhibit 1 to your deposition, which is also Exhibit 5 from

WWW.ARIZONACOURTREPORTERS.COM
GRIFFIN & ASSOCIATES - 602.264.2230

6 (Pages 18 to 21)



# EXHIBIT C

SUPERIOR COURT OF THE STATE OF ARIZONA
COUNTY OF MARICOPA

| | |
|---|---|
| JESSIE THORNTON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) No. CV2013-096393 |
| | ) |
| CITY OF SURPRISE, a jural | ) |
| entity; J.J. OTTERMAN and JANE | ) |
| DOE OTTERMAN, husband and wife; | ) |
| JOHN and JANE DOES I-X; BLACK | ) |
| and WHITE CORPORATIONS I-X, | ) |
| inclusive | ) |
| | ) |
|     Defendants. | ) |
| | ) |


DEPOSITION OF OFFICER JOSHUA JAMES OTTERMAN

Phoenix, Arizona
Friday, April 17, 2015
8:55 a.m.


REPORTED BY:
Kelly M. Olhausen, RPR
Certified Reporter
Certificate No. 50867

PREPARED FOR:

SUPERIOR COURT


(Original)



## Page 50

Q. All right. So either you typed in the license plate number or you called in dispatch for the license plate number, information comes back on the screen, you observe a second or third traffic violation, and then you call in to dispatch that you're making a traffic stop?

A. I don't know if it happened that way.

Q. All those things did happen, though?

A. Correct. Maybe not in that order.

Q. Sure. Do you think you typed in the information or called in the information about the license plate before you saw the first traffic violation?

A. I don't know.

Q. All right. But somewhere in that process is when you got that information?

A. Correct.

Q. All right. And then you decide to initiate a stop and you call it in; correct?

A. Correct.

Q. About the same time you turn on the lights and the siren or during or after?

A. I don't remember.

Q. In pretty close proximity?

A. Correct.

Q. On page 3 of Exhibit 4, which were these time entries we talked about before --

## Page 51

A. Okay.

Q. -- it shows at 23:21, Unit 5A21 arrived. Do you know who that was, either by the number or just your recollection of who arrived first?

A. Oh, I don't know.

Q. Okay. Do you recall who the other officers were that arrived at the scene?

A. The two I remember being there were Officer Karlton and Officer Hernandez.

Q. Did they arrive together or separately?

A. I don't know.

Q. You see that some unit arrived at 23:21; correct?

A. Correct.

Q. And then I see up above, at 14:34 -- I guess 14 minutes after midnight -- 6A42 arrived. Do you see that?

A. Correct.

Q. So you think those two correspond with the two officers you just mentioned -- Hernandez -- and who was the other one?

A. Officer Karlton.

Q. Does that make sense to you?

A. It does.

Q. All right.

A. Actually, I take that back.

## Page 52

Q. Go ahead.

A. Officer Hernandez was on my squad; so his designator would have been an 8, as well as mine.

Q. And that's above you. There is an 8A42.

A. Correct.

Q. So it looks like we have 5A21, 8A42, and 6A42 arriving; so three officers arrived?

A. Correct.

Q. And you recall two of them. You're not sure who the third was?

A. No. Sometimes officers will arrive. If they see that there is several other officers on scene, they will leave. So...

Q. That's fair. But your recollection is Karlton and Hernandez arrived.

A. Correct.

Q. Let's go to the next page. That is your narrative; correct?

A. Correct.

Q. And that consists of two pages?

A. It does. Yep.

Q. I want to go to the first paragraph. Do you see that?

A. Yes.

Q. And it notes that at approximately 23:16, you

## Page 53

observed a white Mitsubishi failed to maintain its lane by crashing over the painted white-striped divider on three occasions; correct?

A. Yes.

Q. And my question to you, is that something you specifically recall as you sit here today or something that you recall from having read this report?

A. I specifically recall.

Q. And you note that the white Mitsubishi was traveling in the center lane; correct?

A. Correct.

Q. And it says you were directly behind the vehicle; correct?

A. Correct.

Q. When you say "directly behind," does that help you recall how close you were to the back of that car?

A. No.

Q. You don't know if it was one car length or two or less?

A. No.

Q. No idea?

A. When I put "directly behind it," the meaning is there is no car in between us. So as far as distance goes, I don't know.

Q. And there is no way for us to know today;



# EXHIBIT D

**Garcia, Liana J.**

| | |
|---|---|
| **From:** | Garcia, Liana J. |
| **Sent:** | Thursday, June 11, 2015 1:07 PM |
| **To:** | 'Elan Mizrahi' |
| **Cc:** | Neal, Kevin D.; Combs, Lincoln; Weaver, Sharlee M. |
| **Subject:** | RE: Thornton v City of Surprise |
| | |
| **Categories:** | #4937595 : 26076 : 0001 |

OK – I understand.  We'll go ahead and file the motion for leave to amend then.
Let me know about the discovery.
Thanks.



Liana J. Garcia
Attorney Profile
liana.garcia@gknet.com
602-530-8172

---

**From:** Elan Mizrahi [mailto:Elan@tbl-law.com]
**Sent:** Thursday, June 11, 2015 12:55 PM
**To:** Garcia, Liana J.
**Cc:** Neal, Kevin D.; Combs, Lincoln; Weaver, Sharlee M.
**Subject:** RE: Thornton v City of Surprise

I decline to stipulate to this.  Before you joined as counsel I had discussions with prior counsel more than a year ago who told me they were going to amend to add federal claims to which I said I would file for removal and while I waited and waited and purposely didn't conduct discovery thinking we would end up in federal court on different claims, it didn't happen.  You and I had the same conversations last year and you never moved to amend.  We then went forward with all the key depositions and now you want to amend.  I understand that leave to amend it typically granted but that doesn't apply where a party has been dilatory like this.  I am prepping for an arbitration next week but will look at your other issue and get back to you.


Elan S. Mizrahi, Esq.
**TITUS BRUECKNER & LEVINE PLC**
**8355 East Hartford Drive, Suite 200**
**Scottsdale, Arizona 85255**
**Phone: 480.483.9600 | Fax: 480.483.3215**
**Email:** elan@tbl-law.com
**Website:** www.tbl-law.com

**TITUS BRUECKNER & LEVINE** PLC
A T T O R N E Y S    A T    L A W

This email message contains information from the law firm Titus Brueckner & Levine PLC that may be confidential or privileged. Such information is intended only for the personal and confidential use of the designated recipient(s), and use by any other party is not authorized. If you are not an intended recipient, any review, disclosure, copying, distribution or use of this message, its contents, or any attachments is strictly prohibited. No responsibility is accepted by the sender for any loss or damage arising in any way from the use of this message or any attachments. If you have received this message in error, please notify the sender immediately, delete the message, and destroy all copies.  Unless otherwise indicated in the body of this message, nothing in this communication is intended to operate as an electronic signature under applicable law.

1

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Dyer, Deputy
9/18/2015 10:59:00 AM
Filing ID 6874867

1   Kevin D. Neal (Bar No. 011640)
    Lincoln Combs (Bar No. 025080)
2   Liana J. Garcia (Bar No. 027452)
    GALLAGHER & KENNEDY, P.A.
3   2575 East Camelback Road
    Phoenix, Arizona  85016-9225
4   Telephone:    (602) 530-8000
    Facsimile:    (602) 530-8500
5   kevin.neal@gknet.com
    lincoln.combs@gknet.com
6   liana.garcia@gknet.com

7   Marc J. Victor (Bar No. 016064)
    Marc J. Victor, P.C.
8   3920 S. Alma School Road, Suite 5
    Chandler, Arizona 85248
9   Telephone:  (480) 455-5233
    Fax:  (480) 857-0150
10  marc@attorneyforfreedom.com

11  Attorneys for Plaintiff Jessie Thornton

12            **SUPERIOR COURT OF THE STATE OF ARIZONA**

13                    **COUNTY OF MARICOPA**

14

15  JESSIE THORNTON,                         No. CV2013-096393

16                  Plaintiff,               **STIPULATION TO EXTEND**
                                             **MEDIATION DEADLINE**
17  v.
                                             (Assigned to the Honorable David K.
18  CITY OF SURPRISE, a jural entity; J.J.   Udall)
    OTTERMAN and JANE DOE
19  OTTERMAN, husband and wife; JOHN
    and JANE DOES I-X; BLACK and WHITE
20  CORPORATIONS I-X, inclusive,

21                  Defendants.

22

23          The parties hereby stipulate and agree that the mediation deadline currently set for

24  September 18 may be extended ninety (90) days through and including December 18,

25  2015, in order to allow the Court to rule on Plaintiff's Motion to Amend Complaint.

26

DATED this 18th of September, 2015.

GALLAGHER & KENNEDY, P.A.


By: */s/ Kevin D. Neal*

    Kevin D. Neal
    Lincoln Combs
    Liana J. Garcia
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225
    Attorneys for Plaintiff Jessie Thornton

TITUS, BRUECKNER & LEVINE PLC


By: */s/ Elan S. Mizrahi*

    Elan S. Mizrahi
    8355 East Hartford Drive, Suite 200
    Scottsdale, Arizona 85255
    Attorneys for Defendant

COPY emailed same day to:

Larry Crown
Elan S. Mizrahi
TITUS, BRUECKNER & LEVINE PLC
8355 East Hartford Drive, Suite 200
Scottsdale, Arizona 85255
*Attorneys for Defendants*

Sharlee Weaver

5052592v1/26076-0001